BAILES, Judge.
In this action plaintiff-appellant, Schweg-mann Brothers Giant Super Markets (Schwegmann) seeks: (a) to enjoin the Louisiana Milk Commission (Commission), defendant-appellee, from enforcing against Schwegmann the price-fixing provisions adopted in the proceedings of the Commission styled Louisiana Milk Commission Docket No. LMC-64-P3, as incorporated *38 in the Commission’s “Final Decision: Price Order Pertaining to Frozen Desserts in All Commission Sales Area; (b) to cause the recision or modification of the Commission’s price-fixing order.
The basis for this action is the alleged invalidity of those sections of Act 340 of 1962, as amended, (LSA-R.S. 40:940.19 (5)), which authorize the Commission to fix wholesale prices on frozen desserts, and consequently the invalidity of the Commission’s price-fixing order under both the Constitution of the United States and the Constitution of the State of Louisiana. Schwegmann alleged it was entitled to injunctive relief in order to avoid irreparable damage and loss of valuable property rights which would be suffered by it, and others similarly situated, if the price-fixing provisions of the above quoted statute and the price-fixing order were enforced against them.
The Commission answered the plaintiff’s petition by what virtually amounts to a general denial, and then in reconvention, alleged that on March 12, 1965, plaintiff began selling half-gallons of ice milk to its customers at a price of 39 cents per half-gallon; that these sales were in violation of the Act which prohibits non-processing retailers (such as the plaintiff) from selling a frozen dessert, as defined by the Act, “for less than 8% above (a) the minimum wholesale price established by the commission for such item or (b) the invoice price, which ever is higher.” It further alleged that the applicable price order relating to frozen desserts establishes a wholesale price on half-gallons of ice milk at 50 cents; that the ice milk involved in such illegal sales was purchased by plaintiff from Pure-Vac Dairy Products Corporation (Pure-Vac) whose plant is in Memphis, Tennessee, and was transported from Pure-Vac’s plant to the New Orleans area by a common carrier; that prior to 1964, plaintiff had purchased certain frozen desserts from Pure-Vac delivered by Pure-Vac in its own or leased vehicles operated by Pure-Vac’s employees; and that the Commission desires and is entitled to an injunction in order to prevent violation by plaintiff of the Orderly Milk Marketing Law during the pendency of this suit, and to enjoin plaintiff from purchasing frozen desserts at prices which are less than the minimum wholesale prices prescribed by the Commission in its price order applicable to frozen desserts, except in those instances where plaintiff purchases frozen desserts which are processed at a plant located outside the State of Louisiana and are transported to plaintiff by means of common or contract carrier. In accordance with the prayer of the reconventional demand of the Commission, the trial court issued a temporary restraining order against the plaintiff, restraining it from procurement of frozen desserts in violation of the price-fixing order of the Commission.
After trial, the district court granted judgment in favor of the Commission and against Schwegmann, dismissing the plaintiff’s suit. Judgment was rendered in favor of plaintiff in reconvention and against plaintiff enjoining and prohibiting plaintiff:
(1) From selling ice cream, ice milk or any other frozen desserts derived from dairy products at a price which is less than the price required by LSA-R.S. 40:940.19 (5) and the Commission’s price-fixing order relative to frozen desserts, and
(2) From purchasing frozen desserts at prices which are less than the minimum wholesale prices prescribed by the Commission in its price order applicable to frozen desserts, except in those instances where plaintiff purchases frozen desserts which are processed at a plant located outside the State of Louisiana, and transported to plaintiff by means of common or contract carrier or by plaintiff’s own mode of transportation.
The following stipulation of facts was entered by the parties:
“A substantial portion of the frozen desserts (ice cream, ice milk, mellorine, etc.) *39 consumed .by Louisiana citizens is manufac-turned outside the state and transported by various means to Louisiana retailers. For example, most of the frozen dessert sold by Swift and Company, Seale-Lily, The Kroger Company, Winn-Dixie and Howard Johnson, are processed in plants located outside the State of Louisiana. In addition, a number of chain supermarkets and ice cream processors obtain a portion of their frozen desserts from processing plants located in.athejc-States.... ,
“On March 12, 1965, Schwegmann commenced selling Camellia brand ice milk in half gallon containers at a retail price of 390 per half gallon at five of its stores in the New Orleans area. Between February 1, 1965, and March 11, 1965, inclusive, Schwegmann’s purchases and sales of frozen desserts were made in compliance with the Orderly Milk Marketing Law and the frozen desserts price order issued by the Commission with an effective date of February 1, 1965. The Commission’s price order established a minimum price on half-gallons of ice milk at 500.
“The Camellia brand ice milk referred to above was purchased from Pure-Vac Dairy Products Corporation whose plant is located in Memphis, Tennessee. The Camellia brand ice milk which Schwegmann commenced selling on March 12, 1965, was transported from Memphis to New Orleans in a ‘piggy-back’ refrigerated truck-trailer by a common carrier, the Illinois Central Railroad Company.
“The purchase price of the Camellia brand ice milk was 310 per half gallon and the transportation cost amounted to approximately 20 per half gallon. The ‘piggy-back’ truck-trailer was first delivered to Schweg-mann’s Gentilly store, where approximately 830 gallons of ice milk were unloaded. Delivery of the truck-trailer to that store (and to Schwegmann’s other stores) was accomplished through use of an Illinois Central Railroad Company tractor.
“The truck-trailer was next delivered to Schwegmann’s Airline store where approximately 675 gallons were unloaded. The vehicle next went to Schwegmann’s Veterans Highway store, where approximately 600 gallons were unloaded. It next went to the Schwegmann’s Annunciation store, where approximately 600 gallons were unloaded, and finally to Schwegmann’s Westside store, where approximately 600 gallons were unloaded. These deliveries constituted approximately 3,300 gallons of the 6,000 gallons shipped.
“Commencing on Monday, March 15, 1965, the applicable freight tariff on file with the Interstate Commerce Commission made it necessary for the Illinois Central Railroad to charge an additional amount for each day the trailer was kept by Schwegmann. This charge is known as a detention charge and the daily amount of this detention charge was as follows:
Monday, March 15 $10.60
Tuesday, March 16 15.90
Wednesday, March 17
and each succeeding day 26.50
A charge of $120 on the shipment of 6,000 gallons of ice milk is equivalent to 10 per half gallon.
“Schwegmann had purchased frozen desserts from Pure-Vac prior to March 12, 1965, but the last purchase prior to that date had been prior to December 31, 1963. During the period between these two dates, Pure-Vac solicited orders by telephone, mail, and personal solicitation, but the prices quoted by Pure-Vac and the prices desired by Schwegmann did not result in the placing of any orders.
“Schwegmann made purchases of frozen desserts from Pure-Vac on a regular basis prior to 1964, perhaps some two or three years ago to the best recollection of Schwegmann employees.
“Pure-Vac is regularly engaged in selling frozen desserts to approximately 50 other Louisiana retailers. Sales are made only to those retailers who are willing and able to accept at least 300 gallons per delivery. *40 Prices vary according to volume purchased. The total cost to the retailer is a combination of two factors as set forth on the annexed Pure-Vac price list. Usually, deliveries of Pure-Vac products to Louisiana retailers are made through use of transportation equipment owned by Pure-Vac or leased by Pure-Vac. These vehicles are driven by Pure-Vac employees.
“Prior to February 1, 1965, Schwegmann purchased frozen desserts from various processors, some located in Louisiana and some located outside Louisiana. During the 12 months preceding February 1, 1965, Schwegmann purchased a substantial proportion of its frozen desserts from Sealtest, including Sealtest frozen desserts packaged under Schwegmann’s private label. During this period, the regular retail price of private label ice cream was 57‡ per half-gallon and the sale price was 54(S per half-gallon. Also during this period, the regular price of ice milk was 49^ per half-gallon and the sale price was 39^ per half-gallon.
“During the 12 months preceding the effective date of the Commission’s price order (February 1, 1965), Schwegmann computed a retail price for frozen desserts by adding an 8% to 10% mark-up to the gross invoice price, without deduction of the 5% refrigeration allowance to which Schweg-mann was entitled.
“Since February 1, Schwegmann has been computing the retail price for frozen desserts by adding an 8% mark-up to the gross invoice price. The net price since February 1, 1965, has been the gross invoice price less the 5% refrigeration allowance and less a 7% volume discount authorized by the Commission’s price order.
“As a result of the change in the spread between net cost and retail price, Schweg-mann has realized a greater net profit per unit on the sale of frozen desserts since February 1, 1965, than was realized prior to that date.
“The retail price charged by two of Schwegmann’s principal competitors prior to February 1,1965, A & P and Winn-Dixie, were approximately the same as the retail price charged by Schwegmann for frozen desserts. The regular retail price of ice cream at the competitors’ stores was 59‡ and the sale price of ice cream at the competitors’ stores was 55&. The regular retail price of ice milk at the competitors’ stores was usually 49‡ and the sale price of ice milk at the competitors’ stores was usually 39‡.”
The evidence in the record attests to the fact that changes in marketing patterns and a trend toward concentration of the dairy industry in the hands of a few large concerns have created the need for regulation in order to prevent destruction of substantial segments of the dairy industry throughout Louisiana.
The first regulatory program initiated by Act 193 of 1958 prohibited sales below cost by processors, required a minimum markup by retailers of not less than 8% on invoice costs and prohibited certain practices such as the giving of discounts, free equipment, signs, storage facilities, financial assistance, as well as many other disruptive sales practices. The initial Act, covered by its provisions, various kinds of milk, milk products and frozen desserts, with the approach to the handling of frozen desserts being the same as that accorded fluid milk. In 1962, the Legislature of Louisiana abandoned the “no sales below costs” approach to the regulation of the industry, and substituted the presently existing statutory authority for the establishment of minimum price by the Louisiana Milk Commission on both fluid milk and the frozen desserts. In Act 340 of 1962, it is provided that the minimum retail markup for frozen desserts is 8% above the minimum wholesale price established by the Commission for such item or the invoice price, whichever is higher.
Although Act 340 of 1962 went into effect in August, 1962, the first price-fixing order of the Commission was not effective until April 1, 1963, and was limited to the *41 metropolitan area of New Orleans, and dealt only with fluid milk products. It was not until February 1, 1965, that the price-fixing- order on frozen desserts became effective. From 1958 unt'il this date, the price regulation of frozen desserts was based on the “no sales below cost” approach.
We find that the principal changes made in 1958 Act by Act 340 of 1962 were the following :
1. It created the Louisiana Milk Commission ;
2. It authorized the Commission to set minimum wholesale and retail prices on the so-called “fluid milk products” and wholesale prices only on the “frozen desserts.” The requirement of an 8% minimum markup by retailers was continued in effect for the “frozen desserts”; and
3. It transferred from the Commissioner of Agriculture to the Commission the authority to regulate trade practices. The Commissioner of Agriculture retained the authority to establish minimum prices to be paid to dairy farmers for raw milk.
Inasmuch as the plaintiff’s attack is primarily based on the Legislature granting the Commission the authority to set minimum wholesale prices of frozen desserts, it appears needful to quote the pertinent portion of the statute.
LSA-R.S. 40:940.19 — Powers and duties
“The commission is hereby declared to be the instrumentality of the State for the purpose of administering the provisions of this Subpart and of executing the Legislative intent expressed in this Subpart; provided, however, that the commission shall have no authority to administer or execute R.S. 40:940.4 and R.S. 40:940.8 of this Subpart, the authority for administering these Sections being vested in the Commissioner of Agriculture and Immigration of the State of Louisiana. The commission is hereby vested with the following powers and duties:
* * * * * *
“(5) It shall establish the minimum prices at which those items listed or referred to in R.S. 40:940.1(2) [1] are sold to any person who purchases for purpose of resale. In establishing different prices for various grades and qualities of any of the items listed or referred to in R.S. 40:940.1(2), the commission shall give due consideration to ingredient cost differences and other cost differences and shall establish minimum prices for the principal grades or quality categories which reflect such cost differences.
“The minimum prices established by the commission for mellorine, sherine, and olarine shall not exceed 75% of the minimum price established for frozen desserts having comparable butterfat content.
“It is unlawful for a handler, processor, distributor, or non-processing retailer to sell to any person not buying for purpose of resale, a frozen dessert for less than 8% above (a) the minimum wholesale price established by the commission for such item or (b) the invoice price, which ever is higher.”
The plaintiff’s attack on the statutory provisions of the Commission’s authority to establish and fix the wholesale frozen dessert prices is based on the proposition that these statutory provisions are unconstitutional as violative of the due process guarantees of the Constitution of this state.
The other prong of the plaintiff’s attack on the action of the Commission is couched in this language in his brief. First; The Commission lacks authority to regulate the *42 wholesale prices of frozen desserts in sales transactions by a processor in another state of products shipped into Louisiana in interstate commerce. Secondly; the interstate commerce clause and the supremacy clause of the United States Constitution preclude economic regulation by the State of Louisiana or the Louisiana Milk Commission of interstate transactions involving frozen desserts and all other milk products.
Plaintiff’s specification of error is more simply stated. It contends “the District Court erred in its judgment sustaining the constitutional validity of the provisions of Act 340 of 1962, as amended (La.R.S. 40:940.19(5)) and the orders of the Louisiana Milk Commission (Commission Order in Docket LMC-64 — P3) that authorize and establish wholesale and retail prices on ‘frozen desserts’, including the regulation of interstate transactions affecting the price of frozen desserts.”
Plaintiff argues that the statutory provisions, supra, raise three fundamental constitutional issues under the due process guarantees of Article I:
“First, the regulation of wholesale frozen dessert prices does not constitute a proper, constitutional exercise of the police powers for the recognized purpose of regulation in the interest of controlling the local production of fluid milk products, and other similar purposes, since the ingredients in ‘frozen desserts’ come from surplus milk suppliers or come from non-fresh sources (milk powder, etc.) that do not affect the legitimate regulatory aspects of the local regulation of fluid milk products.
“Second, the exercise of the police power to regulate the lawful business of Schweg-mann Brothers is not undertaken for the protection of the public safety, health and general welfare, but constitutes an arbitrary restriction upon the conduct of Schweg-mann Brothers’ business, unrelated to the protection of the public safety, the public health, or the general welfare.
“Third, the application of the provisions of Act 340 of 1962 as amended, to Schweg-mann Brothers would render the statute invalid on the ground that the means adopted are not reasonably necessary and appropriate for the accomplishment of any proper legislative purpose, since this is the first statutory and administrative attempt to fix wholesale prices on such luxury products as frozen desserts under color of police authority to regulate local milk prices and supplies.”
It further argues that the mere legislative assertion that a statute relates to public health, safety or welfare cannot insulate the statute from judicial review; that the court must determine whether the statute is designed to accomplish a purpose properly within the scope of the police power, i. e., assuring adequate supplies of wholesome milk; and that in the absence of clear and direct relationship to the public safety, health and welfare, principles of due process apply to invalidate arbitrary and unnecessary legislation.
Plaintiff relies heavily on the reasoning of the Supreme Court in the cases of Schwegmann Brothers v. Louisiana Board of Alcohol Beverage Control (1949) 216 La. 148, 43 So.2d 248, as well as Reynolds v. Louisiana Board of Alcohol Beverage Control (1966) 249 La. 127, 185 So.2d 794, which was consolidated for decision with the Schwegmann Brothers case and Martin case against the same defendant. The rationale of these cases is in no wise controlling or persuasive of' determination of the instant case. There is a wide gulf of differences between the purported exercise of police power in the minimum price fixing of intoxicating liquors and beverages under the finding of the court in those cases, and the regulation of the minimum price structure for the marketing of fluid milk and frozen desserts in the instant case.
In the 1949 Schwegmann case cited supra, the Supreme Court, after stating that it is indisputable that the liquor traffic can be regulated, even prohibited, by the valid *43 exercise of the police power, the regulating there being essential to the general health, peace, good order, and morals of the people, held that:
“ * * * we conclude that the provisions of Act 360 of 1948 which relates to the mandatory minimum mark ups (Section l(s), 24 and 26) do not tend, in a degree that is perceptible and clear, toward the accomplishment of the announced purpose of the statute, namely, the regulation and control of the liquor traffic so that it ‘may not cause injury to the economic, social and moral well-being of the people of the State.’ They, in other words, are inappropriate for the achievement of the legitimate object described in the statute. Accordingly, we hold that such provisions are manifestly unreasonable within the contemplation of the state’s police power, and, hence, are unconstitutional in that they violate the due process clauses of our state and federal constitutions.”
In the 1966 Schwegmann case, the identical question was before the court, and again in that instance the court concluded: “ * * * It (the statute) bears no real or substantial relation to the general health, morals, or welfare of the people. At least, it represents an ignoble flight from competition. It violates the Due Process Clauses of the State and Federal Constitutions. We hold it unconstitutional.”
The record provides evidence of unfair trade practices, particularly involving display shelf space preferences by National Food Stores to Sealtest, a large distributor of dairy products. It convinces us that unfair trade practices were indulged in both by ice cream manufacturers and retailers with an obvious advantage flowing to each through the marketing of frozen desserts. Such conduct and practice is detrimental to the economic existence, growth and well being of the dairy industry of this state.
This practice was particularly prevalent in the Baton Rouge trade area where a disproportionate and small share of locally produced dairy products found outlet through normal channels of the National Food Stores.
We believe, and do find, that the rationale of the court in Schwegmann Brothers Giant Super Markets v. McCrory (1959) 237 La. 768, 112 So.2d 606, to be controlling of the question of legitimate exercise of police power. It has been demonstrated sufficiently, and to our satisfaction, that the regulation of the minimum price, wholesale and retail, of frozen desserts is a matter which properly involves the exercise of the police power of the state. We find that a sufficient quantity of fluid milk, having a classification other than Class I, finds its way into the manufacture of frozen desserts to materially affect the economic existence and well being of the dairy industry of this state to amply justify the exercise, by the legislature, of the police power inherent in the state for the regulation of the minimum wholesale and retail prices of frozen desserts.
In Nebbia v. People of State of New York (1934) 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940, Justice Roberts, speaking for the majority of the court, stated:
“[10-12] So far as the requirement of due process is concerned, and in the absence of other constitutional restriction, a state is free to adopt whatever economic policy may reasonably be deemed to promote public welfare, and to enforce that policy by legislation adapted to its purpose. The courts are without authority either to declare such policy, or, when it is declared by the legislature, to override it. If the laws passed are seen to have a reasonable relation to a proper legislative purpose, and are neither arbitrary nor discriminatory, the requirements of due process are satisfied, and judicial determination to that effect renders a court functus officio. ‘Whether the free operation of the normal laws of competition is a wise and wholesome rule for trade and com *44 merce is an economic question which this court need not consider or determine.’ Northern Securities Co. v. United States, 193 U.S. 197, 337, 338, 24 S.Ct. 436, 457, 48 L.Ed. 679. And it is equally clear that if the legislative policy be to curb unrestrained and harmful competition by measures which are not arbitrary or discriminatory it does not lie with the courts to determine that the rule is unwise. With the wisdom of the policy adopted, with the adequacy or practicability of the law enacted to forward it, the courts are both incompetent and unauthorized to deal. The course of decision in this court exhibits a firm adherence to these principles. Times without number we have said that the Legislature is primarily the judge of the necessity of such an enactment, that every possible presumption is in favor of its validity, and that though the court may hold views inconsistent with the wisdom of the law, it may not be annulled unless palpably in excess of legislative power.
“ * * * The Constitution does not secure to any one liberty to conduct his business in such fashion as to inflict injury upon the public at large, or upon any substantial group of the people. Price control, like any other form of regulation, is unconstitutional only if arbitrary, discriminatory, or demonstrably irrelevant to the policy the Legislature is free to adopt, and hence an unnecessary and unwarranted interference with individual liberty.”
Also see Louisiana Wholesale Distributors Assn. v. Rosenzweig (1948) 214 La. 1, 36 So.2d 403, wherein the Supreme Court said:
“Such acts have consistently been held not to be price fixing statutes. They merely fix the level below which producers and distributors may not sell without injury to a competitor and, ultimately, to the community. Clearly, therefore, in adopting this state’s Unfair Sales Act for the protection of our economic structure and to prevent the creation or perpetuation of monopolies, the legislature was acting well within its police power. And since the act has neither been alleged nor shown to be arbitrary or discriminatory and on examination its context shows it is broad in its scope and uniform and fair in its operation and is not violative of any of the personal or contractual rights guaranteed to our citizens by the federal and state constitutions, it is our conclusion that the statute is constitutional.”
All acts of the legislature are presumed to be constitutional, and the burden is with the plaintiff who attacks the constitutionality of the act to show wherein its provisions are violative thereof. The plaintiff has failed to sustain this burden.
Plaintiff contends the Commission, by its actions in this case, has run afoul of the interstate commerce clause of the federal constitution. It argues, by inference certainly, that the Commission has attempted to regulate the whole price of frozen desserts in sales transactions by a processor (Pure-Vac) in another state of products shipped into Louisiana in interstate commerce.
We find the opposite to be the case. The Commission has specifically excepted and excluded from its order the fixing of a minimum wholesale price of frozen desserts shipped in interstate commerce by common carrier or contract carrier.
The Commission has fixed the minimum wholesale price of frozen desserts shipped into the state by the processor in its own or leased equipment for sale to Louisiana retailers such as the plaintiff, and -it argues that this is a legitimate exercise of the statutory authority of the Commission. We find that this question is not properly before us and we refrain from passing on whether such shipments are in interstate commerce.
The argument of the Commission, in its well written and well reasoned brief *45 properly disposes of the final argument of the plaintiff that the supremacy clause of the federal constitution precludes economic regulation of interstate transactions involving frozen desserts.
“In Parker vs. Brown, 317 U.S. 341 [63 S.Ct. 307, 87 L.Ed. 315] (1942) the Supreme Court upheld the validity of a state marketing program in California involving raisins in spite of the fact that the Agricultural Marketing Agreement Act of 1937, 7 U.S.C. § 601 et seq., gave to the Federal Secretary of Agriculture the authority to promulgate federal orders regulating the marketing of this commodity.
“The court found that the state program in the Parker Case did not violate the Federal Commerce Clause even though 'approximately ninety-five per cent of the California raisin crop finds its way into interstate or foreign commerce’ and even though the program operated ‘to eliminate competition of the producers in the terms of sale of the crop, including price.’ 317 U.S. 341, 359 [63 S.Ct. 307, 87 L.Ed. 315],
“The Supreme Court held specifically that the adoption of the Agricultural Marketing Agreement Act of 1937 did not, by itself, preclude the effective operation of the state law. There is some dictum in the opinion to the effect that a state program would be superseded by the issuance of a federal order dealing with the same subject matter as the state program, but that dictum is of no value in the case at bar because no federal order regulating wholesale or retail prices of frozen desserts is applicable within the State of Louisiana at this time.
“In a more recent case, Florida Lime & Avocado Growers vs. Paul, 373 U.S. 132, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963), the U. S. Supreme Court upheld the validity of a California statute defining maturity for avocados sold in California even though the California definition excluded some avocados which met the maturity standards established by federal authorities in Florida acting under authority of the Agricultural Marketing Agreement Act of 1937.
“On the subject of pre-emption, the Court said:
‘The principle to be derived from our decision is that the federal regulation of a field of commerce should not be deemed pre-emptive of state regulatory power in the absence of persuasive reason — either that the nature of the regulated subject matter permits no other conclusions, or that the Congress has unmistakably so ordained. See e.g., Huron Portland Cement Co. v. [City of] Detroit, 362 U.S. 440, 4 L.Ed.2nd 852, 80 S.Ct. 813, 78 ALR2d 1294, supra.’
“The contention that Congress had, by the enactment of the Agricultural Marketing Agreement Act of 1937, pre-empted the field so as to exclude regulation of milk prices by the State of Virginia, was one of the contentions rejected by the Court in the County Board of Arlington County case [County Board of Arlington County, Virginia v. State Milk Commission (1954) 346 U.S. 932, 74 S.Ct. 374, 98 L.Ed. 423].
“The case of Pearce v. Freeman is not in point because, in that case there was a direct conflict between the federal regulation and that issued by the state. No such conflict is involved in the present proceeding.”
For the above and foregoing reasons, we conclude that the statutory provisions (LSA-R.S. 40:940.19(5)) authorizing the Louisiana Milk Commission to determine and establish minimum wholesale prices for frozen desserts as defined and designated in LSA-R.S. 40:940.1(2), and the legislature itself fixing the minimum retail price for frozen desserts, is a proper exercise of the police power inherent in the state by the legislature thereof.
We further conclude that the Louisiana Milk Commission has not sought to regulate or fix the minimum wholesale price *46 of frozen desserts moving in interstate commerce, and that the matter of such regulation is not properly before the court in the absence of showing that the said Commission has attempted such a regulation.
Finally, we hold that the regulation of the minimum price of frozen desserts, both wholesale and retail, has not been preempted by the federal government under the enactment of the Agricultural Marketing Agreement Act of 1937.
The judgment of the district court is affirmed at appellant’s costs.
Affirmed.

. “§ 940.1(2) Ice cream, fruit ice cream, nut ice cream, ice milk, frozen malt ice cream or frosted malt ice cream, French ice cream, milk sherbets, ices or water ices, mellorine, olarine, sherine, the mix from which any such frozen dessert is made, and all other products which may be defined as. frozen desserts by the Louisiana state board of health. Added Acts 1958, No. 193, § 1, as amended Acts 1962, No. 340, § 1.”