**FLORIDA LIME AND AVOCADO GROWERS, INC., a Florida corporation, and South Florida Growers Association, Inc., a Florida corporation, Plaintiffs,**

v.

**Charles PAUL, Director of the Department of Agriculture of the State of California; Edmund G. Brown, Governor of the State of California; and Stanley Mosk, Attorney General of the State of California, Defendants.**

Civ. No. 7648.

United States District Court
N. D. California, N. D.

July 10, 1961.

Isaac E. Ferguson, North Hollywood Cal., for plaintiffs.

Stanley Mosk, Atty. Gen. of California, and John Fourt, Deputy Atty. Gen., for defendants.

Before BONE, Senior Circuit Judge and GOODMAN, Chief Judge and HALBERT, District Judge.

HALBERT, District Judge.

Plaintiffs instituted this suit against certain officials[1] of the State of California. Plaintiffs seek an injunction against the enforcement of certain portions of the California Agricultural Code, which plaintiffs contend to be in conflict with the Commerce and Equal Protection Clauses of the Federal Constitution, and with the Federal Agricultural Marketing Agreement Act of 1937 (Title 7 U.S.C.A. § 601 et seq.) and Flor-

1. The motion to substitute Charles Paul, Director of Agriculture of the State of California. for defendant Warne, his predecessor in that office, will be granted (Federal Rules of Civil Procedure, Rule 25(d)), 28 U.S.C.

ida Avocado Order No. 69 issued under the said Act.

The plaintiffs are Florida growers and packers of avocados, engaged in the interstate marketing of their product. They ship avocados into California, among other states. California has a law (California Agricultural Code, § 792) which requires avocados to contain not less than 8% oil by weight, excluding skin and seed, before they can be sold for human consumption. Plaintiffs' object in bringing this suit is to prevent the future application of this law to avocados which they wish to market in California.

This Court initially dismissed the action for want of a present, actual case or controversy (Florida Lime & Avocado Growers v. Jacobsen, 169 F.Supp. 774). The United States Supreme Court reversed this decision, holding that there is an existing dispute amounting to a justiciable controversy which plaintiffs are entitled to have determined on the merits (Florida Lime & Avocado Growers v. Jacobsen, 362 U.S. 73, 80 S.Ct. 568, 4 L.Ed.2d 568).

The case has now been heard by a three-judge Court, pursuant to the provisions of Title 28 U.S.C. §§ 2281 and 2284. The evidence has been heard, with the rulings on certain objections by defendants having been reserved. Both sides have argued and briefed their positions, and the case is submitted to the Court for its determination.

The Court will not, at this time, rule on the objections made by defendants to plaintiffs' evidence on which the Court has reserved its ruling. The exhibits and depositions are very voluminous, as are the objections to them. We will assume, *arguendo,* that the exhibits and depositions offered by plaintiffs are all admissible. Likewise, we do not consider it necessary at this time to hear the evidence which defendants propose to offer in rebuttal to plaintiffs' exhibit 16 for identification.[2]

### The Facts

California is the major producer of avocados in the United States. Virtually all of the rest of the avocados produced in the United States are raised in Florida. California grows principally avocados of Mexican origin, of which there are a number of differing individual varieties. Florida grows principally avocados of various "hybrid" varieties. About 12% of Florida's production consists of West Indian varieties. These are declining in importance, owing to poor shipping qualities, short shelf life and the susceptibility of the trees to freezing.

In 1925, practically all of the avocados produced in the United States came from California.[3] In that year, California adopted the requirement that all avocados marketed in this State contain at least 8% oil by weight, excluding the skin and seed. There was then, and still is, a body of respectable scientific opinion to the effect that the oil content of avocados in the hard state is the best indicator of maturity.

Avocados are customarily picked and marketed in a hard state. After purchase by the consumer, they are allowed to soften and ripen. If the avocados are picked while immature, they shrivel up and become useless when they soften. They become rubbery and unpalatable, with an unpleasant after-taste. It they are picked when mature, they ripen while softening, and become palatable and desirable (to those who like them).

It is not simple or easy to tell whether an avocado which has just been picked, in a hard state, is, or is not, mature. A person of great experience can make a well educated guess as to whether or

---

2. It is recognized that the right had been reserved to defendants to introduce such evidence at a further hearing, if necessary (See: pp. 190–191 of the trial transcript). We are of the view that such evidence is not necessary.

3. Florida's current high production of avocados results from heavy plantings which began in or about 1940. The trees then planted did not bear fruit until eight or ten years after being planted.

not such an avocado is mature, but the only sure test is to let it ripen and eat it.

There is a temptation on the part of growers to rush immature avocados to the market at the start of the season, when mature avocados are scarce and the price is high. The ordinary retailer and consumer do not realize that the avocados are immature until after they have purchased the fruit and allowed it to soften. The marketing of such avocados cheats the consumer, and it has a bad effect upon retailers and producers as a whole, since it increases future sales resistance.

To prevent the marketing of immature avocados, it is desirable to establish standards by which one can tell which avocados are immature at the time that they are picked. There is expert opinion to the effect that the best standard to be used for such purpose is the percentage of oil in the fruit. Other expert opinion rejects this yardstick. It seems to be conceded by all that there is no better physical test than oil content by which to judge the maturity of the hard fruit by itself (other than to use the time-consuming method of letting it ripen and tasting it). Size and appearance are possible tests, but are not reliable. There is a body of expert opinion which holds that the best test of maturity is to establish picking dates for the fruit. The test used for purposes of the Florida Avocado Order is based upon picking dates.

The picking date method works as follows: For each variety of avocado in a particular production area, A, B and C dates are promulgated on the basis of past experience. No avocados of a particular variety may be picked until the A date for that variety. On and after the A date, fruit of a certain size and weight may be picked and shipped. On and after the B date, fruit of a smaller size and weight may be picked and shipped. On and after the C date, all restrictions of size and weight are removed.

The fruit growing on different trees of the same varieties matures at different times, depending on the age of the trees, the weather, soil conditions, etc. The fruit upon a particular tree does not all mature at the same time. Differences of size and weight are of assistance in picking the mature from the immature fruit which has all been picked from the same tree, but they are not infallible guides. The picking date method, then, inevitably must let some immature fruit go to market, or keep some mature fruit off the market, or both.

Mexican varieties of avocados contain (generally speaking) the highest oil content of any varieties, when mature. Hybrid varieties attain the next highest oil percentages, and West Indian the lowest. Hybrid varieties generally attain oil content in excess of 8% if left on the trees long enough, but they do not necessarily attain such an oil content by the time that they may be marketed under the Florida Avocado Order. They are mature enough to be acceptable prior to the time that they reach that content, according to plaintiffs' witnesses. West Indian varieties do not attain an 8% oil content until they are past their prime.

California is the State of greatest consumption of avocados. In 1955–1956, California produced about two-thirds of the avocados consumed in the United States, and consumed over two-thirds of its own production, in addition to being a prime market for Florida avocados.

Plaintiffs have made fairly sizeable shipments of avocados to California in the past. Over 95% of them have passed the 8% oil content test. The other shipments have mostly been reshipped to other western states, although it is permissible under the California system to recondition shipments by removing the most immature avocados in the hope of passing the test. The difficulty here appears to be the lack of external indicia of maturity or oil content. Plaintiffs' monetary losses as a result of the rejected shipments are not clearly established, but at most do not appear to be over two

or three thousand dollars. Plaintiffs' shipments furnish proof that the California test does not *per se* bar Florida avocados from the California market.

Plaintiffs offered testimony to the effect that there are wide variations in oil content among avocados picked from the same tree, but that tasters could not pick out the high oil avocados by taste.[4] Defendants offered testimony to the effect that the oil test was a good test of maturity, and was the best test available. In our opinion, the testimony on behalf of the defendants, under all of the circumstances, is more convincing and entitled to greater weight.

Dr. Harding (plaintiffs' witness) stated that an oil content test might make a satisfactory test of maturity, if the percentage required were set independently for different varieties. No physical test (or picking date test) is perfect, but this Court is convinced that the most satisfactory physical test for the maturity of avocados is some sort of oil content test.

### Equitable Jurisdiction

■ A Court of equity has a certain discretion as to whether it should exercise its equitable jurisdiction in any particular case. Defendants argue that plaintiffs have made no showing of threatened irreparable damage to them, such as would justify the issuance of an injunction suspending the enforcement of the laws of the State of California.[5] If the instant case were before this Court for the first time, the Court would decline to take equitable jurisdiction, on the showing made by plaintiffs (See: Watson v. Buck, 313 U.S. 387, 61 S.Ct.

962, 85 L.Ed. 1416; A. F. of L. v. Watson, 327 U.S. 582, 66 S.Ct. 761, 90 L.Ed. 873).

■ If the Court were required to take equitable jurisdiction of the instant case, coming before this Court for the first time, it might well be advisable for the Court to retain jurisdiction of the case, pending an authoritative interpretation of the California law by the California Courts, which might be expected to result from the declaratory judgment proceeding which defendants have now brought against plaintiffs in the Superior Court of the State of California, in and for the County of Sacramento.[6] (See: A. F. of L. v. Watson, supra).

This case is now before this Court, however, with a mandate from the United States Supreme Court, directing this Court to conduct further proceedings consistent with the opinion of the Supreme Court. In that opinion, it is stated that plaintiffs herein are entitled to have this controversy decided upon the merits. This Court concludes, therefore, that in the instant case this Court has no discretion to decline equitable jurisdiction or to retain jurisdiction while awaiting State Court decision.

### The Merits of the Controversy

In the remainder of this opinion, we will consider, first, the Constitutional validity of the California law (A) in relation to the Equal Protection Clause of the Fourteenth Amendment to the Federal Constitution, and (B) in relation to the Commerce Clause of the Federal Constitution. Then we will consider the question of whether the California

---

4. It was not explained how plaintiffs' witnesses surmounted the inherent difficulties of such a test. The oil test is ordinarily made when the fruit is hard. It ordinarily involves the destruction of the fruit. Even if only half of an individual avocado were tested, the other half would not ripen normally. If the oil test were made on soft fruit, it would not conform to the California test, and there would be a danger of a biased sampling of fruit (That is, the test might be made only on fruit which had given physical indications during softening that it was mature.).

5. For some discussion of the delicacy of the exercise of such equitable power, see the material in footnote 5 of Florida Lime & Avocado Growers v. Jacobsen, supra, at 362 U.S. 77, 80 S.Ct. 571.

6. Case No. 125826, in the records of that Court.

law is in conflict with Federal laws or regulations.

■ In considering these questions, one must bear in mind that the burden of proof is upon plaintiffs herein to establish all the elements of their case by a preponderance of the evidence (31 C.J.S. Evidence § 104, pp. 713–714; O'Brien v. Equitable Life Assur. Society, 8 Cir., 212 F.2d 383; and See: United States v. Denver & R. G. Ry. Co., 191 U.S. 84, 24 S.Ct. 33, 48 L.Ed. 106; Northern P. Ry. Co. v. Lewis, 162 U.S. 366, 16 S.Ct. 831, 40 L.Ed. 1002; and Morse v. Fields, D. C., 127 F.Supp. 63).

Moreover, in discussing due process limitations on the legislative power of the State of California, it must be noted that it is not enough for plaintiffs simply to establish that the legislation in question is out of harmony with a particular school of thought (Williamson v. Lee Optical Co., 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563). They must go beyond that. If it should be found that there is a respectable body of opinion in the light of which the enactment is reasonable, then it is for the Legislature, not this Court, to hold the balance between two conflicting schools of thought, and to decide which of them preponderates.

Constitutionality of the California Law

### A. Equal Protection

Plaintiffs contend that the California 8% oil content test is arbitrary and unreasonable, and in violation of the Equal Protection Clause of the Fourteenth Amendment to the Federal Constitution.

■ The Equal Protection Clause does not require perfection in legislative classification (See: Phillips Chemical Co. v. Dumas School District, 361 U.S. 376, 80 S.Ct. 474, 4 L.Ed.2d 384). It is not enough that a classification by State law is discriminatory; it must be arbitrary and unreasonable before the Equal Protection Clause may be invoked to strike it down (Allied Stores of Ohio v. Bowers, 358 U.S. 522, 79 S.Ct. 437, 3 L.Ed.2d 480, and Borden's Farm Products Co. v. Ten Eyck, 297 U.S. 251, 56 S.Ct. 453, 80 L.Ed.

669). It is for the Legislature, not the Courts, to write the laws. The people, if the Legislature commits abuses, have their remedy at the polls (Williamson v. Lee Optical Co., supra).

■ It must be conceded that the 8% oil content requirement has worked effectively to bar immature avocados from the California markets. It is clearly established that an oil content test is the best available physical test for maturity. The only real issue is whether California must establish different percentages of required oil content for different kinds of avocados. There are hundreds of varieties of avocados. If each is to have its own required oil content, it is almost inevitable that the regulation must in time come under the control of the producers. The California Legislature cannot be expected to establish, after considered deliberation, hundreds of standards. If two or three categories are established, it will not always be an easy matter to decide in which category a particular variety may belong. These difficulties offer reasonable support for the decision of the State of California to enact a single uniform standard. This is perfectly proper for "not only the final purpose of the law must be considered, but the means of its administration" (St. John v. People of State of New York, 201 U.S. 633, 26 S.Ct. 554, 555, 50 L.Ed. 896).

The police powers of California might reasonably be applied to insure a minimum oil content of the avocados for the sake of the higher nutritional value of the avocado, even if there were no issue of the maturity of the fruit. Legislation imposing a minimum butterfat content requirement on milk sold for human consumption has been customary in this country for many years (See: St. John v. People of State of New York, supra). Such legislation disregards the fact that different breeds of cattle naturally produce different amounts of butterfat in their milk. It imposes a uniform requirement on all milk sold for human consumption, whether from Jersey or Holstein cows. There is no good reason

why a similar requirement cannot be imposed on all avocados sold for human consumption. The general consuming public has traditionally given best acceptance to the richer kinds of milk. A requirement of similar richness for avocados would appear to be reasonable.[7]

Granting the possibility of a better law than the one devised by the California Legislative authorities, that does not require a finding that the law which *has* been passed is unconstitutional. The test is whether it is unreasonable and arbitrary. We hold that it is not.

### B. Interstate Commerce

■ It is patent that the California law is designed to prevent the marketing of immature avocados for human consumption in California. Such an enactment is not automatically invalidated because some of the avocados in question move into the State in interstate commerce (See: Milk Control Board of Pennsylvania v. Eisenberg Farm Products Co., 306 U.S. 346, 59 S.Ct. 528, 83 L.Ed. 752; Simpson v. Shepard, 230 U.S. 352, 33 S.Ct. 729, 57 L.Ed. 1511). It is competent for a state to adopt protective measures for the health, safety, morals and welfare of its people, although interstate commerce may incidentally be involved (Simpson v. Shepard, supra; Mintz v. Baldwin, 289 U.S. 346, 53 S.Ct. 611, 77 L.Ed. 1245). State legislation, based on police power, which does not discriminate against interstate commerce is not in conflict with the Commerce Clause (Huron Portland Cement Co. v. City of Detroit, 362 U.S. 440, 80 S.Ct. 813, 4 L.Ed.2d 852).

The question of whether the California law discriminates against interstate commerce is more difficult. It is clearly established that the law complained of was passed for a valid police purpose, without thought at the time of its passage of discriminating against Florida avocados. Florida avocados were of no commercial importance at the time that California adopted the 8% oil content requirement. It is admitted that there is no discrimination in the enforcement of the law. The only question is whether the 8% oil content requirement is inherently discriminatory against interstate commerce in the circumstances which now exist.

Some of the varieties of avocados grown in Florida cannot with commercial practicability meet the 8% requirement. These are the West Indian varieties. The bulk of West Indian avocados grown in Florida are Waldins, which do attain 8% oil content, but are practically unmarketable at that time. The West Indian avocados, however, are difficult to market in distant states at any stage in their development, due to poor shipping qualities and short shelf life. Interference with the marketing of West Indian avocados in California is, for all practical purposes, within the maxim of *de minimis non curat lex*.

West Indian varieties are in fact discriminated against because of their qualities, not because they are shipped in interstate commerce. Avocados of the West Indian varieties are not as rich as the fruit of the varieties which do meet the 8% requirement. The application of the 8% requirement in California, ever since 1925, has naturally prevented the commercial development in this State of any varieties which cannot meet the requirement. As proof that there is no discrimination against interstate commerce as such, we see that the overwhelming majority of the shipments of avocados made by plaintiffs to this State have been marketed successfully after passing the California test.

Looking at the testimony of plaintiffs' witness, Dr. Harding, we see that the hybrid avocados may be "acceptable,"

---

7. The State of California, which imposes the 8% oil content requirement, seems to have extremely good consumer acceptance of avocados. In 1955–1956, with less than a tenth of the Nation's population, the people of California consumed approximately half of the avocados consumed in the United States. This may be due to other factors than the fact that California consumers can rely on getting 8% oil. But it may be largely due to that fact.

but not necessarily in "prime condition," before they reach the 8% oil requirement. Plaintiffs want to market them before they reach prime condition, in order to get the high prices which prevail at the start of the season. This is the very sort of practice which the California law was enacted to prevent. California producers may no longer jump the gun in this fashion. It is not discriminatory treatment, but equality of treatment, of which plaintiffs seem to complain.

■ We hold, then, that the California 8% oil requirement is not unconstitutional.

### Alleged Conflict Between State and Federal Law

■ The remaining question for the Court is whether the California 8% oil requirement must give way in the face of Florida Avocado Order No. 69, which was issued under the authority of the Federal Agricultural Marketing Agreement Act of 1937.

The Federal law attempts to prevent the marketing of immature avocados by Florida producers by an application of the picking date method of determining maturity. The Federal law says that Florida producers may not market their avocados unless they are picked and shipped in accordance with the shipping dates promulgated. It does not say that they *may* market their avocados without further inspection by the states, if they comply with the shipping dates established by the Federal Order. When the Congress of the United States means to exert its constitutional supremacy thus, it is able to say so in clear and explicit terms (See: Title 21 U.S.C.A. § 121).

The Federal law does not cover the whole field of interstate shipment of avocados. It would be lawful to raise avocados in Texas or Louisiana and ship them into California without complying with Florida Avocado Order No. 69, or any similar Federal order.[8] California

avocados may be shipped to any state of the United States without complying with Florida Avocado Order No. 69, or any similar order.

California consumers are not given complete protection from the marketing of immature avocados by any Federal law or order. For all that the Federal law declares, avocados grown in any state but Florida may be sold in California without any standards designed to insure maturity. It is clear that insofar as California forbids the marketing of avocados with less than 8% oil content grown anywhere but in Florida, the California law is not in conflict with Federal law or regulations. Nor does it directly conflict with the explicit terms of such law or regulations, even when applied to Florida-grown avocados.

California has lawfully applied an 8% oil content test to avocados marketed by her own producers, which may be applied to any state not covered by the Federal Order. If the implication of Federal pre-emption of the field is read into Florida Avocado Order No. 69 and the act under which it was issued, Florida producers alone will be privileged to avoid compliance with that test. Such an implication should not lightly be made (Cloverleaf Butter Co. v. Patterson, 315 U.S. 148, 786, 62 S.Ct. 491, 86 L.Ed. 754). Congress, not having covered the whole field of interstate transportation of avocados, has left a wide field for the protection of consumers by the states by the appropriate exercise of the state police power (See: Reid v. State of Colorado, 187 U.S. 137, 23 S.Ct. 92, 47 L.Ed. 108). The case would be different if the Federal Government had established a complete and uniform regulatory scheme which covered the whole problem (See: Oregon-Washington R. & Nav. Co. v. Washington, 270 U.S. 87, 46 S.Ct. 279, 70 L.Ed. 482), but this the Congress has not done.

Plaintiffs derive some comfort from the case of Mintz v. Baldwin, supra. In

8. At present, no state of the United States, excepting Florida and California, raises avocados in significant quantity.

that case, the granting of a Federal certificate would have prevented the application of state inspection requirements, only because the Federal law there interpreted expressly so stated.

In Cloverleaf Butter Co. v. Patterson, supra, it was declared that where a Federal statute does not in specific terms prohibit state action, it must be clear that the Federal provisions are inconsistent with those of the state, before prohibition of state action may be inferred. It was further held that the Federal Government had established its own exclusive regulation of the manufacture of the product there involved, to the exclusion of state regulation of such manufacture. However, it was stated that if the finished product were offered for sale in a state, it would be subject to the pure food laws of that state. To infer that the California 8% oil content requirement is not applicable to Florida avocados because of Florida Avocado Order No. 69, this Court would be required to overrule Cloverleaf Butter Co. v. Patterson, supra. This, the Court has neither the power nor the inclination to do.

Both the State and the Federal requirements may be, and are being, enforced, without any clash between the two authorities. We are enjoined by the highest authority against seeking out conflict between state and Federal regulation, unless such conflict clearly exists (Huron Portland Cement Co. v. City of Detroit, supra).

We conclude that plaintiffs cannot prevail in this case, upon the merits thereof. The California law which plaintiffs have called in question is not in conflict with any provision of the United States Constitution, or with any Federal law or regulation.

It is, therefore, ordered that plaintiffs take nothing by this action, and that judgment herein be, and it is, rendered against plaintiffs and in favor of the defendants.

And it is further ordered that defendants prepare findings of fact and conclusions of law, a form of judgment, and all other documents necessary for the full and complete disposition of this case in accordance with this Memorandum and Order, and lodge them with the Clerk of this Court pursuant to the applicable rules and statutes.

<div align="center">

HOMER T. BONE

Senior Judge, United States Court of Appeals for the Ninth Circuit.

LOUIS E. GOODMAN

Chief Judge, United States District Court for the Northern District of California.

SHERRILL HALBERT

United States District Judge.