### SCHWEGMANN BROTHERS GIANT SUPER MARKETS
### v.
### LOUISIANA MILK COMMISSION.
Civ. A. No. 3166.

United States District Court,
M. D. Louisiana.

Oct. 26, 1973.

Paul O. H. Pigman, Michael R. Fontham, Stone, Pigman, Walther, Wittmann & Hutchinson, New Orleans, La., for plaintiff.

Ellis C. Magee, Legal Counsel, Louisiana Milk Commission, John V. Parker, Sanders, Miller, Downing & Kean, Baton Rouge, La., for defendant.

Before INGRAHAM, Circuit Judge, and WEST and HEEBE, District Judges.

E. GORDON WEST, District Judge:

Schwegmann Brothers Giant Super Markets is a Louisiana partnership which operates several large retail food stores in the New Orleans metropolitan area. Among the food items sold by Schwegmann are frozen desserts such as ice cream, ice milk, sherbert and similar products. In 1965 Schwegmann was doing business with Pure-Vac Dairy Products Corporation, a manufacturer of frozen desserts. Pure-Vac is a corporation organized under the laws of the State of Tennessee, with its principal offices and its only processing plant located in that state. Pure-Vac maintains no

offices or agents in the State of Louisiana.

Originally both Schwegmann and Pure-Vac brought suits to challenge the constitutionality of parts of the Louisiana Orderly Milk Marketing Law, as amended in 1962, which created the Louisiana Milk Commission and granted it the power to set retail prices on certain milk commodities. (LSA–R.S. 40:940.-1–40:940.23). The two suits, because of their similar nature, were consolidated for hearing before this three judge court. On February 15, 1973, Pure-Vac, after a change in ownership, filed a motion to dismiss and its suit against the Louisiana Milk Commission was dismissed without prejudice, leaving this suit by Schwegmann as the only remaining litigation.

The defendant alleges that the dismissal of the Pure-Vac suit has a material effect on the status of the Schwegmann proceeding and has filed two motions which must be disposed of before reaching a decision on the merits.

The defendant filed a motion for summary judgment alleging that the issue of the constitutionality of the Louisiana Orderly Milk Marketing Law as between Schwegmann and the Louisiana Milk Commission is res judicata because of a 1963 state court decision. In March of 1963 Schwegmann instituted proceedings in Louisiana's Nineteenth Judicial District Court to enjoin the Louisiana Milk Commission from enforcing against Schwegmann Brothers the minimum prices incorporated in the Commission's price order for the New Orleans area. Schwegmann Bros. Giant Super Markets v. La. Milk Commission, No. 93,121, 19th Judicial District Court, Parish of East Baton Rouge. Schwegmann's petition alleged that the Commission's actions were invalid under both the Constitution of the United States and the Constitution of Louisiana. Schwegmann alleged particularly that the Commission's price fixing was violative of the 14th Amendment in that it deprived the plaintiff of due process and equal protection of the laws.

The state court determined that there were three points to be decided on the question of constitutionality: First, whether or not the State of Louisiana may regulate the milk industry at all; second, if it can be regulated, were adequate standards, safeguards and guidelines set up in the act creating the milk commission; and third, did the Commission act within the scope of the legislative guidelines and standards in issuing its price orders. The state court answered all of these questions in the affirmative and dismissed Schwegmann's suit at his cost. Schwegmann failed to exercise his right of appeal from this adverse decision.

The defendant now urges that this prior state court judgment acts as a bar to any further constitutional challenges by Schwegmann to the Louisiana Orderly Milk Marketing Law. The defendant recognizes that the 1963 complaint and the court's decision related mostly to Fourteenth Amendment claims and neither the Supremacy Clause nor the Commerce Clause which are now raised in the instant suit were specifically pleaded or argued to the state court. Nevertheless the defendant argues that Schwegmann had an opportunity to fully litigate all of its claims as to the unconstitutionality of the act, and that therefore the state court decision acts as a bar to all constitutional claims that were either raised or that could have been raised by Schwegmann at the time of the state court suit. The defendant urges that Schwegmann could have raised the Commerce Clause and the Supremacy Clause in 1963 but failed to do so, and therefore he should not be allowed to raise them now in this suit. They contend that the plaintiff is subjecting them to piecemeal litigation in that he raised certain federal constitutional questions in the state court and lost, and now seeks to initiate a separate suit between the same parties involving the same issues, but alleging different constitutional objections. The defendant contends that the state court decision and Schwegmann's failure to appeal now

bars further litigation on the constitutional issues actually raised in the state court as well as those that could have been raised, and that therefore this instant suit should be barred either as res judicata, or by the application of the doctrine of judicial estoppel.

■ The plaintiff on the other hand maintains that res judicata does not apply in this case under either federal or state principles, citing the federal full faith and credit provisions of 28 U.S.C. § 1738 and maintaining that the federal court must give the Louisiana judgment exactly the same effect which it would enjoy in a Louisiana court. Article 2286 of the Louisiana Civil Code provides:

"The authority of the thing adjudged takes place only with respect to what was the object of the judgment. The thing demanded must be the same; the demand must be founded on the same cause of action; the demand must be between the same parties, and formed by them against each other in the same quality."

While the Louisiana doctrine of res judicata is much narrower than the common law doctrine of judicial estoppel, it has nevertheless been held that not only is a final judgment conclusive of every plea or defense made but also of every plea or defense which either of the parties might successfully have made at the time of trial. Quinette v. Delhommer, 165 So.2d 900 (La.App. 4th Cir.—1964). In addition to this relaxing of the strict requirement for res judicata as set forth in La.Civil Code Article 2286, supra, some Louisiana courts have, in a limited sense, recognized the common law doctrine of judicial estoppel. For example, in California Company v. Price, 234 La. 338, 99 So.2d 743 (1957), the Louisiana Supreme Court held that "[E]ven if res judicata cannot be strictly applied the parties * * * are bound by judicial estoppel which extends to every material allegation or statement made on one side in the prior * * * case and denied on the other which was determined in the course of the proceedings." See also

Sargent Caufield v. Fidelity & Casualty Co. of N. Y., 247 F.Supp. 851 (E.D.La. —1965), aff'd, 378 F.2d 876 (CA 5– 1967). While this holding has been criticized, (see American Mannex Corp. v. Prejean, 328 F.Supp. 940, 943 (D.C. 1971), it is nevertheless an indication of an acceptance by the highest court of Louisiana of a limited application of the doctrine. But even recognizing this extension of the doctrine of res judicata, and the limited acceptance of the doctrine of judicial estoppel by the Louisiana courts, the conclusion must necessarily be reached in the instant case that neither doctrine is applicable under the circumstances of this case. While the federal court hearing the second case will give great consideration to the State's interpretation of its doctrines of res judicata and judicial estoppel, it is not necessarily bound by those interpretations.

"The extent to which a federal court must attach conclusive effect to prior state court proceedings is a federal question. * * * Section 1738 of Title 28, United States Code, directs that judicial proceedings of the court of any State 'shall have the same full faith and credit in every court within the United States . . . as they have by law or usage in the courts of such State . . . from which they are taken.' When the parties and the cause of action litigated are the same in state court as in federal court, the doctrine of res judicata has been held to bar federal relitigation, even if a federal constitutional question is in dispute.

"This does not necessarily mean, however, that a federal court is invariably bound to a state's own interpretation of res judicata or judicial estoppel. Other well-defined federal policies, statutory or constitutional, may compete with those policies underlying section 1738." American Mannex Corporation v. Rozands, 462 F.2d 688, 689–690 (CA 5–1972).

The simple fact is that the legal issues raised in the state court suit were not

the same as the legal issues raised here, nor could they have been. When the 1963 state court action was instituted the Louisiana Milk Commission had just come into existence and its first price fixing orders had not even gone into effect. The price fixing orders had not yet had any effect on interstate commerce and only by predicting the future could the plaintiff have seriously argued the Commerce Clause claim in the state court suit. The plaintiff also asserts that in 1963 the Commission had not yet entered into areas of economic regulation which were pre-empted by federal regulations and therefore the Supremacy Clause argument would have also been premature. In State Farm Automobile Ins. Co. v. Duel, 324 U.S. 154, 65 S.Ct. 573, 89 L.Ed. 812 (1945), the court held that intervening legal developments may preclude the application of res judicata to dismiss an issue not raised in a prior proceeding. Plaintiff in *Duel* had failed to raise a Commerce Clause claim in state court, but a later decision by the Supreme Court indicated that the claim would have validity. The Court stated:

> "Wisconsin has the familiar rule that though the validity of the law in question might have been determined in an earlier suit, the prior judgment is not res judicata where the second suit is on a different cause of action in absence of evidence to show that the question was actually presented to the court and decided in the earlier litigation. * * * But if that principle is inapplicable here it is nevertheless the general rule that res judicata is no defense where between the time of the first judgment and the second there has been an intervening decision or a change in the law creating an altered situation." 65 S.Ct. 577.

The Fifth Circuit, in *Rozands*, supra, indicates by its language that *factual*, as well as legal developments may effect the application of res judicata. In holding that the prior state court decision did bar the subsequent suit they stated:

> "In addition, it should be noted that there has been no change in the significant facts and no significant legal development relevant to this constitutional issue since Mannex submitted its case to the Louisiana Supreme Court. We express no view as to the appropriateness of today's result in the setting of significant factual or legal change occurring in the interim separating state and federal court adjudication of the same constitutional issue between the same parties." 462 F.2d at 690–691.

■ It is therefore the opinion of this Court that under the application of Louisiana principles of res judicata and/or because of the significant changes in the factual and legal situation since the state court decision, this present action is not completely barred by the principle of res judicata, nor is it completely barred by the doctrine of judicial estoppel. This conclusion in no way means that the Court is withdrawing all significance from the 1963 state court decision. That decision is res judicata and binding as to all constitutional issues that were in fact presented and argued to the state court. This instant proceeding will not re-hash those issues already decided, and this Court will limit itself to a consideration of the Commerce Clause and Supremacy Clause claims which were not specifically dealt with in the state court case.

■ The Commission has also filed a motion to dissolve the three judge court that has been convened in this case. They contend that the jurisdiction of the three judge court rests upon the Commerce Clause claim made by the plaintiff and that an examination of that claim discloses that the thrust of the complaint is directed toward alleged improper execution and enforcement of the statute rather than the unconstitutionality of the statute itself. The Commission maintains that the adjudication of a claim alleging unconstitutional application of a valid statute does not require a three judge court and therefore such court should be dissolved in this proceeding.

Title 28, United States Code, Section 2281 provides the situations in which a three judge court must be convened:

"An interlocutory or permanent injunction restraining the enforcement, operation or execution of any State statute by restraining the action of any officer of such State in the enforcement or execution of such statute or of an order made by an administrative board or commission acting under State statutes, *shall not be granted by any district court or judge thereof upon the ground of the unconstitutionality of such statute* unless the application therefor is heard and determined by a district court of three judges under section 2284 of this title." (Emphasis added.)

The plaintiff contends that the actions of the Louisiana Milk Commission which are complained of are authorized under the statute in question and as long as the Commission's enforcement of its orders is authorized by the statute, a three judge court is necessary to hear an attack on the constitutionality of the Commission's application of the law. There is no doubt but that a statutory three judge court has authority, and indeed is required to hear cases involving attacks on the constitutionality of state statutes, regardless of whether the attack is made on the face of the statute or on the manner in which the statute is applied. In Phillips v. United States, 312 U.S. 246, 61 S.Ct. 480, 85 L.Ed. 800 (1941), the Court said:

"To bring this procedural device into play—to dislocate the normal operations of the system of lower federal courts and thereafter to come directly to this Court—requires a suit which seeks to interpose the Constitution against enforcement of a state policy, whether such policy is defined in a state constitution or in an ordinary statute or through the delegated legislation of an 'administrative board or commission'. The crux of the business is procedural protection against an improvident state-wide doom by a

federal court of a state's legislative policy. * * *

" * * * In other words, the complainant must seek to forestall the demands of some general state policy, the validity of which he challenges. No one questions Oklahoma's authority to give her Governor 'Supreme Executive power' nor to make him Commander-in-Chief of her militia. What is here challenged is a single, unique exercise of these prerogatives of his office." 61 S.Ct. at 483–484.

In the more recent case of Turner v. Fouche, 396 U.S. 346, 90 S.Ct. 532, 24 L.Ed.2d 567 (1970) the Supreme Court made the following observations:

"We reject the appellees' suggestion that we lack jurisdiction to entertain an appeal from the District Court on the theory that a court of three judges was not required under 28 U.S.C. § 2281 because the appellants sought to enjoin only the acts of county officials. The jury commissioners and members of the board of education were 'functioning pursuant to a statewide policy and performing a state function.'

\*    \*    \*    \*    \*    \* .

"The appellees also propose a distinction between attacks on statutes and attacks upon the results of their administration, and urge that the appellants' case comes within the latter category. But this argument overlooks the line, delineated by our past decisions, that falls between a petition for injunction on the ground of the unconstitutionality of a *statute,* either on its face or as applied, which requires a three-judge court, and a petition seeking an injunction on the ground of the unconstitutionality of the result obtained by the use of a statute not attacked as unconstitutional.

" * * * Further, the District Court properly entertained the question whether the constitutional and statutory complex, even if not invalid on its face, was unconstitutionally ad-

ministered. Without regard to whether that issue was one by itself warranting a three-judge court, * * * it related to the appellants' claim that Georgia's school-board selection procedure was unlawful on its face." 90 S.Ct. at 536 Footnote 10.

The present case does not involve a situation where a statute is misread or misapplied. The Louisiana Milk Commission has state-wide authority and performs a state function. The Louisiana courts have clearly stated that the Louisiana Orderly Milk Marketing Law authorizes the specific conduct of which the plaintiff complains. This is not an attack on an unauthorized or unconstitutional enforcement of a valid statute, but is an attack on that part of the statute, either on its face or as applied, which authorizes what is alleged to be unconstitutional burdens on interstate commerce. A substantial constitutional claim is raised in this suit as to the effect the statute has on interstate commerce and therefore the three judge court is required. The defendant's motion to have it dissolved must be denied.

The plaintiff has brought suit here to challenge the constitutionality of parts of the Louisiana Orderly Milk Marketing Law, as amended in 1962, LSA–R.S. 40:940.1–40.940.23. A brief examination of that law is useful to an understanding of the issues involved. The stated purpose of the Louisiana Orderly Milk Marketing Law, first passed in 1958, is to insure an adequate supply of wholesome milk to the people of the State of Louisiana. In order to accomplish this purpose the statute took steps to protect the dairy industry of the State by (1) proscribing certain disruptive sales practices, (2) enabling the Milk Commission to set minimum prices to be paid producers (the persons who own and control the cows) for their raw milk, and (3) proscribing the sale of milk products by any one at below costs. *See,* Dakin, "State Regulation of Business—The New 'Milk Audit' Law", 23 La.Law Rev. 70 (1962).

Generally, the 1962 amendment changed prior law by establishing a seven member Milk Commission and giving it the power to set minimum prices not only on producers' milk but also on the sale of milk and milk products by persons other than producers who derive a profit from processing or handling milk or milk products in their course from the milk producer to the ultimate consumer. Therefore the Milk Commission set the minimum prices for processors, handlers, wholesalers and retailers.

The Milk Commission, by statute, can regulate the following products:

"(1) All grade A raw milk for pasteurization, regular milk, standardized milk, whole pasteurized milk, special milk, vitamin D and homogenized milk, plain or creamed buttermilk, cottage cheese, creole cream cheese, flavored milk, flavored milk drink, skim milk, fluid cream, concentrated milk (except when sold in hermetically sealed containers), and any mixture of skim milk and butterfat not included in R.S. 40:940.1(2).

"(2) Ice cream, fruit ice cream, nut ice cream, ice milk, frozen malt ice cream or frosted malt ice cream, French ice cream, milk sherbets, ices or water ices, mellorine, olarine, sherine, the mix from which any such frozen dessert is made, and all other products which may be defined as frozen desserts by the Louisiana state board of health." LSA–R.S. 40:940.-1(1) and (2).

Although the plaintiff challenges the entire Orderly Milk Marketing Law and the authority of the Milk Commission to regulate any milk prices, only subsection (2) which defines frozen desserts is directly concerned with this litigation.

The price fixing authority with regard to the Milk Commission and its operation is found in LSA–R.S. 40:940.-19(4) and (5):

"(4) It [the Milk Commission] shall establish the minimum and may establish the maximum prices at which

those items listed or referred to in R. S. 40:940.1(1) are sold by handlers, distributors and non-processing retailers to any person.

"(5) It [the Milk Commission] shall establish the minimum prices at which those items listed or referred to in R. S. 40:940.1(2) are sold to any person who purchases for the purpose of resale. In establishing different prices for various grades and qualities of any of the items listed or referred to in R.S. 40:940.1(2), the commission shall give due consideration to ingredient cost differences and other cost differences and shall establish minimum prices for the principle grades or quality categories which reflect such cost differences.

  \*   \*   \*   \*   \*   \*

"It is unlawful for a handler, processor, distributor, or non-processing retailer to sell to any person not buying for the purpose of resale, a frozen dessert for less than 8% above (a) the minimum wholesale price established by the commission for such item or (b) the invoice price, which ever is higher."

The Commission sets minimum prices after consideration of the costs of the ingredients, the normal and necessary operating expenses, and the profit a dealer in milk should clear in order to remain in business. See Dakin, "State Regulation of Business—The New 'Milk Audit' Law", supra, at page 74. The theory behind the price fixing is that if the State of Louisiana sets minimum prices on milk products, it will assure dealers in milk and milk products a reasonable profit, thereby encouraging them to remain in business and insuring an adequate supply of milk for the area. It is, of course, the consumer who guarantees the milk industry the reasonable profits determined by the Commission by paying higher prices for milk.

Soon after the Orderly Milk Marketing Law was amended, Schwegmann filed this suit in federal court challenging the constitutionality of the law. He subsequently brought a suit in March of 1965 in the state courts of Louisiana which likewise challenged the law and sought to obtain an injunction against its enforcement. Prior to the filing of an answer by the Commission in the state court suit, Schwegmann purchased 6000 gallons of ice milk in half-gallon containers from Pure-Vac. The price paid was 33 cents per half-gallon which was 17 cents less than the prevailing minimum price set by the Commission. The merchandise was transported from Pure-Vac's Memphis plant to the New Orleans area by the Illinois Central Railroad through the use of a refrigerated piggy-back truck. As noted earlier, Pure-Vac is a Tennessee corporation and maintains no offices or agents in Louisiana.

After this purchase was made by Schwegmann, the Commission answered the state court suit with a reconventional demand seeking to enjoin Schwegmann from purchasing ice milk out of state at less than the Commission's minimum price and from selling this ice milk to consumers within the State of Louisiana at less than 8% above the minimum price set by the Commission in accord with R.S. 40:940.19(5).

The state trial court enjoined Schwegmann from selling in Louisiana any of the products purchased out of state at below minimum prices. The state court also enjoined Schwegmann from buying outside of the state at below minimum prices where the purchased ice milk was transported into the state from Tennessee by trucks owned by Pure-Vac, while at the same time refusing to enjoin Schwegmann from purchasing out of state at below minimum prices where the purchased ice milk was shipped into Louisiana by common or contract carrier or by Schwegmann's own mode of transportation.

While there can be no serious dispute as to the validity of the state court's order enjoining Schwegmann from selling within Louisiana at below minimum prices, the plaintiff does find objectionable that portion of the Court's decision which dealt with the out of state pur-

chases at below minimum prices set by the Commission.

The state court's judgment reads in part:

"For the written reasons this day assigned, there is judgment dismissing plaintiffs' suit at plaintiffs' costs, further ordering that there be judgment herein in favor of the defendant and against plaintiffs, perpetuating the preliminary injunction previously issued herein, enjoining and prohibiting plaintiffs * * * from selling ice cream, ice milk or any other frozen dessert derived from dairy products at a price less than the price required by L.R.S. 40:940.19(5) and the Commission's price order relative to frozen desserts and from purchasing frozen desserts at prices which are less than the minimum wholesale prices prescribed by the Louisiana Milk Commission in its price order applicable to frozen desserts, except in those instances where plaintiffs purchase frozen desserts which are processed at a plant located outside the State of Louisiana and are transported to the plaintiffs by means of common or contract carriers or by plaintiffs' own mode of transportation." Order of Judgment Schwegmann Brothers Giant Super Markets v. Louisiana Milk Commission, No. 105, 106, 19th Judicial District Court, Parish of East Baton Rouge, Louisiana.

The Court's judgment states that Schwegmann may purchase frozen desserts from Pure-Vac at whatever price Pure-Vac will agree on, so long as the goods are transported into Louisiana by (1) common carrier, (2) contract carrier, or (3) Schwegmann's own mode of transportation. The fourth alternative, transportation into Louisiana by Pure-Vac's mode of transportation, is excluded. Pure-Vac sells in large volume lots and usually ships its goods by its own refrigerated trucks because other methods of transportation do not provide the necessary refrigeration for ice milk; therefore the state court's judgment in effect prevents them from selling to a Louisiana purchaser such as Schwegmann at below the prices set by the Milk Commission.

This instant suit in Federal Court was stayed pending appeals of the state court proceedings. The Louisiana First Circuit Court of Appeals affirmed the state trial court, Schwegmann Brothers Giant Super Markets v. Louisiana Milk Commission, 200 So.2d 37 (La.App. 1st Cir. 1967), and the Louisiana Supreme Court, with one dissent, declined to grant writs. Schwegmann Brothers Giant Super Markets v. Louisiana Milk Commission, 251 La. 51, 202 So.2d 658 (1967).

Once the state litigation was completed, the stay order on the federal proceedings was lifted and this case has now been submitted to this three judge court for determination of whether the Louisiana Orderly Milk Marketing Law and action under it by the Louisiana Milk Commission contravene either the Commerce Clause or the Supremacy Clause of the Federal Constitution.

*The Commerce Clause.*

Essentially, the issue raised concerning the constitutionality of the Louisiana Orderly Milk Marketing Law in the light of the Commerce Clause is very narrow: Does the Commerce Clause prevent the Milk Commission, acting under the authority vested in it by the statute, from requiring Schwegmann to pay the minimum price fixed by the Commission on sales of ice milk made in Tennessee if Pure-Vac ships that ice milk into Louisiana in its own trucks?

This Court finds that the case of Baldwin v. G. A. F. Seelig, 294 U.S. 511, 55 S.Ct. 497, 79 L.Ed. 1032 (1935) controls the determination of the Commerce Clause issue. In *Baldwin*, a Vermont producer sold its milk to a New York retailer. Title passed by consent in Vermont and the delivery of the milk was made from Vermont to New York by rail. The New York law set minimum prices to be paid by dealers to producers and effectively required the New York retailer to pay the Vermont producer

that minimum price, for if he did not, the retailer could not offer his newly acquired Vermont milk for resale in New York. Suit was brought by the retailer to restrain the enforcement of the New York law insofar as it required it to pay the Vermont producer the minimum price. Justice Cardozo, speaking for the Court, noted that it was legal to make New York retailers pay the minimum price to New York producers.

> "The New York Milk Control Act, with the aid of regulations made thereunder, has set up a system of minimum prices to be paid by dealers to producers. The validity of that system in its application to producers doing business in New York state has support in our decisions." 55 S.Ct. at 498.

However, it was also held that it was contrary to the Commerce Clause to require New York retailers to pay the minimum prices to out of state producers for milk purchased outside of New York. The Court determined that if New York could require its retailers to pay out of state producers the same minimum price that had to be paid to New York producers, New York would in effect be neutralizing the natural advantages of Vermont which enabled it to produce its milk at less cost and to consequently sell it at lower prices. Such "neutralization" was equivalent to placing a duty on Vermont milk equal to the difference between the New York minimum price and the price at which Vermont farmers could offer their product. This is precisely what the Commerce Clause was designed to prevent. The Court noted:

> "New York has no power to project its legislation into Vermont by regulating the price to be paid in that state for milk acquired there. So much is not disputed. New York is equally without power to prohibit the introduction within her territory of milk of wholesome quality acquired in Vermont, whether at high prices or at low ones. This again is not disputed. Accepting those postulates, New York asserts her power to outlaw milk so introduced by prohibiting its sale thereafter if the price that has been paid for it to the farmers of Vermont is less than would be owing in like circumstances to farmers in New York. The importer in that view may keep his milk or drink it, but sell it he may not.

> "Such a power, if exerted, will set a barrier to traffic between one state and another as effective as if customs duties, equal to the price differential, had been laid upon the thing transported. Imposts or duties upon commerce with other countries are placed, by an express prohibition of the Constitution, beyond the power of a state, 'except what may be absolutely necessary for executing its inspection Laws.' Constitution, art. 1, § 10, cl. 2; Woodruff v. Parham, 8 Wall. 123, 19 L.Ed. 382. Imposts and duties upon interstate commerce are placed beyond the power of a state, without the mention of an exception, by the provision committing commerce of that order to the power of the Congress. Constitution, art. 1, § 8, cl. 3. 'It is the established doctrine of this court that a state may not, in any form or under any guise, directly burden the prosecution of interstate business.' International Textbook Co. v. Pigg, 217 U.S. 91, 112, 30 S.Ct. 481, 487, 54 L.Ed. 678, * * *. Nice distinctions have been made at times between direct and indirect burdens. They are irrelevant when the avowed purpose of the obstruction, as well as its necessary tendency, is to suppress or mitigate the consequences of competition between the states. Such an obstruction is direct by the very terms of the hypothesis. We are reminded in the opinion below that a chief occasion of the commerce clauses was 'the mutual jealousies and aggressions of the States, taking form in customs barriers and other economic retaliation.' * * * If New York, in order to promote the economic welfare of her farmers, may guard them against

competition with the cheaper prices of Vermont, the door has been opened to rivalries and reprisals that were meant to be averted by subjecting commerce between the states to the power of the nation." 55 S.Ct. at 499–500.

Commenting on New York's argument that the true purpose of the price fixing legislation was to assure the people of New York an adequate supply of wholesome milk, and not to achieve an economic advantage for the milk industry of the State, the Court stated:

"The argument is pressed upon us, however, that the end to be served by the Milk Control Act is something more than the economic welfare of the farmers or of any other class or classes. The end to be served is the maintenance of a regular and adequate supply of pure and wholesome milk; the supply being put in jeopardy when the farmers of the state are unable to earn a living income. * * * Price security, we are told, is only a special form of sanitary security; the economic motive is secondary and subordinate; the state intervenes to make its inhabitants healthy, and not to make them rich. On that assumption we are asked to say that intervention will be upheld as a valid exercise by the state of its internal police power, though there is an incidental obstruction to commerce between one state and another. This would be to eat up the rule under the guise of an exception. Economic welfare is always related to health, for there can be no health if men are starving. Let such an exception be admitted, and all that a state will have to do in times of stress and strain is to say that its farmers and merchants and workmen must be protected against competition from without, lest they go upon the poor relief lists or perish altogether. To give entrance to that excuse would be to invite a speedy end of our national solidarity. The Constitution was framed under the dominion of a political philosophy less parochial in range. It was framed upon the theory that the peoples of the several states must sink or swim together, and that in the long run prosperity and salvation are in union and not division." 55 S.Ct. at 500.

Thus, *Baldwin* says that a state may not, through a law fixing minimum prices on milk and milk products for the purpose of securing an adequate supply of wholesome milk for its inhabitants, neutralize an economic advantage possessed by a neighboring state by imposing its minimum price standards on the products purchased in that neighboring state.

The opinion of the Louisiana trial court is in keeping with *Baldwin* insofar as it refuses to enjoin Schwegmann from buying from Pure-Vac in Tennessee at a price below the minimum set by the Commission when delivery is made by "means of common or contract carrier or by plaintiff's own mode of transportation." The state court did, however, enjoin Schwegmann from purchasing from Pure-Vac at prices less than the minimum when Pure-Vac delivered the merchandise to Louisiana in its own trucks. It is the plaintiff's contention that this part of the state court's judgment allows interstate commerce to be burdened.

In its reasons for judgment, the state court judge relied upon the case of State of Mississippi ex rel. Patterson v. Pure Vac Dairy Products Corporation, 170 So.2d 274 (Miss.Sup.Ct.1964), for distinguishing between delivery by contract or common carrier and delivery by Pure-Vac. In that case, which is the strongest in support of the Commission's position, the Mississippi Supreme Court, on facts almost identical to those presented in the present case, found that under the circumstances presented, title passed in Mississippi rather than at Pure-Vac docks in Tennessee. The court then concluded that because the title passed in Mississippi, Pure-Vac was a producer doing business in that state and the sales were subject to regulation by Mississippi. The court noted that Pure-Vac

had previously used salesmen to peddle its merchandise from store to store within the State of Mississippi and had only recently changed its operation to the procedure where orders were sent to Tennessee and filled F.O.B. at Pure-Vac's docks. It found no "substantial difference" between the present operation and the one before it, and noted that *Baldwin* did not control because the state was only regulating the price charged for milk products sold in Mississippi.

The Louisiana trial court reviewed the facts and law of the Mississippi case and concluded:

"The Court, therefore, is of the opinion that Louisiana cannot regulate the price paid to a processor or producer outside the State of Louisiana where the sale is consummated completely in the foreign state. Therefore, as previously stated by this Court, each transaction of that sort would have to be examined by the Court in order to determine whether or not the sale was consummated in Louisiana or outside of Louisiana. In the Pure Vac case in Mississippi where the seller delivered the products to the purchaser in a rented or owned vehicle, this Court would be of the opinion that the ruling in the Mississippi case could be followed. However, where the purchaser and seller completely consummate the sale in another state and the goods are delivered or brought back to this state by the purchaser, this Court would be of the opinion that the wholesale price involved in such transaction would not be subject to regulation by this state."

The Court of Appeal, affirming the lower court, did not pass on the issue of interstate commerce:

"The Commission has fixed the minimum wholesale price of frozen desserts shipped into the state by the processor in its own or leased equipment for sale to Louisiana retailers such as the plaintiff, and it argues that this is a legitimate exercise of the statutory authority of the Com-

mission. We find that this question is not properly before us and we refrain from passing on whether such shipments are in interstate commerce." Schwegmann Brothers Giant Super Markets v. La. Milk Commission, 200 So.2d 37, 44 (La.App. 1st Cir. 1967).

■ After a careful examination of this complex question of law, aided by exhaustive and scholarly briefs, this court concludes that the state trial judge was incorrect in holding that the Commission could force Schwegmann to pay Pure-Vac the minimum prices if Pure-Vac delivered the ice milk into Louisiana in its own trucks. Under *Baldwin* there can be no doubt that Louisiana could not regulate the price paid Pure-Vac if Schwegmann purchased the ice milk in Tennessee and it was shipped to Louisiana by common or contract carrier. And we fail to see why that result should change merely because instead of shipping the goods into Louisiana by common carrier, Pure-Vac transports them by its own trucks as long as (1) the ice milk was produced in Tennessee, (2) title passed there, and (3) Pure-Vac conducts no other business operation in Louisiana other than its delivery, as bailee, of ice milk it has sold to a Louisiana retailer. If on the other hand Pure-Vac sold its ice milk in Louisiana, that is if title passed here, as for example, if it conducted a store-to-store peddling operation, it would be doing business in Louisiana and subject to regulation here.

■ Insofar as passage of title is concerned, a stipulation of the parties to a contract of sale as to the point at which title to the thing sold will pass from seller to buyer, under both the Louisiana Civil Code and the Uniform Commercial Code, is determinative. *See* "Passage of Title and Risk of Loss Under the U.C.C. and Louisiana Law," 27 La.Law Rev. 299 (1967).

On July 12, 1973, another statutory three judge court in this Circuit decided a case involving some of the same issues here involved. That case was Baxley, et al. v. Alabama Dairy Commission, et al.,

Civil Action No. 3176–N on the docket of the United States District Court for the Middle District of Alabama, 360 F. Supp. 1159. In that case the Alabama Dairy Commission apparently issued regulations requiring out-of-state distributors and in-state retailers to sell at prices fixed by the Dairy Commission *for all sales within the state.* The court found this not to constitute a burden on interstate commerce and found no significant difference between that regulation and the one approved by the United States Supreme Court in Milk Control Board v. Eisenberg Farm Products, 306 U.S. 346, 59 S.Ct. 528, 83 L.Ed. 752 (1939) whereby a state was allowed to set the price at which a distributor *bought* milk from in-state producers even though all of the milk so purchased was being transported out of the state. But in both *Eisenberg* and *Baxley,* the transactions being regulated were those occurring within the regulating state. In *Eisenberg,* the regulation covered milk bought by a distributor from in-state producers. In *Baxley,* the regulation required out-of-state distributors and in-state retailers to sell at prices fixed by the Dairy Commission *for all sales within the state.* Neither *Eisenberg* nor *Baxley* conflicts with our holding in this case. We merely hold, as did *Eisenberg* and *Baxley,* that there is no constitutional infirmity in a state regulation requiring that purely in-state transactions be governed by the Commission's pricing schedules. This does not constitute a burden on interstate commerce even though the product sold within the state and whose selling price is there regulated, originates outside of the state where it is ultimately sold. But we further hold that even though Louisiana has the power and the right to regulate the price at which milk products are sold within the State of Louisiana, it has no power to project its legislation into Tennessee by regulating the price to be paid in that state for milk acquired there. See Baldwin v. G. A. F. Seelig, 294 U.S. 511, 55 S.Ct. 497, 79 L. Ed. 1032 (1935).

■ This court is of the opinion that no particular section of the Orderly Milk Marketing Act is per se unconstitutional because of interference with interstate commerce. However, we are of the opinion that the interpretation of the authority granted by that statute is unconstitutional in respect to regulation of purchases made out of state. The Milk Commission must be enjoined from requiring Schwegmann Brothers to conform to its minimum prices insofar as purchases are made out of state, regardless of the mode of transportation employed.

*The Supremacy Clause*

The final argument made by the plaintiff is that the Louisiana Milk Marketing Law is invalid in its entirety under the Supremacy Clause, Art. VI, cl. 2, coupled with the Commerce Clause, Art. I, Sec. 8, cl. 3, of the United States Constitution. Specifically, plaintiff argues that Congress, in enacting the Agricultural Marketing Act of 1937, 7 U.S.C. Section 601 et seq., pre-empted the field of milk marketing in interstate commerce and that in enacting the Robinson-Patman Act, 15 U.S.C. Sections 13–13c and 21a, pre-empted the field of price competition regulation in interstate commerce, thereby prohibiting the states from regulating at all in these areas. Schwegmann contends that since the Louisiana statute attempts to regulate in each of these areas, such statutes are invalid. The Court finds these contentions without merit.

The law is clear that although the Congress is given the power to regulate interstate commerce by the Constitution, the individual states may also regulate areas affecting interstate commerce if (1) Congress has not signified its intention to exclusively regulate the area, and (2) the state law is not in actual conflict with a congressional enactment, and (3) the state regulation does not discriminate against or unreasonably burden interstate commerce.

Complainant does not attempt to show any actual conflict between a federal statute and the challenged state statute,

although they do allege that the state statute does conflict with general federal policy in this area. The case of Florida Lime and Avocado Growers, Inc. v. Paul, 197 F.Supp. 780 (N.D.Cal.1961) also involved an allegation of pre-emption of the marketing requirements for avocados by the Federal Agricultural Marketing Act of 1937 and sought to have a California regulation declared invalid under the Supremacy Clause. The District Court made the following comments about pre-emption:

"In Cloverleaf Butter Co. v. Patterson, [315 U.S. 148, 62 S.Ct. 491, 86 L.Ed. 754] it was declared that where a Federal statute does not in specific terms prohibit state action, it must be clear that the Federal provisions are inconsistent with those of the state, before prohibition of state action may be inferred. * * *

"Both the State and the Federal requirements may be, and are being, enforced, without any clash between the two authorities. We are enjoined by the highest authority against seeking out conflict between state and Federal regulation, unless such conflict clearly exists * * * ." 197 F.Supp. at 788.

In the instant case there has been shown no *actual* conflict between the state and federal regulations, therefore, it only remains to be determined whether or not the federal statutes specifically preclude any and all state regulation in the field.

Insofar as pre-emption by the Agricultural Marketing Act is concerned, the petitioner relies heavily upon Pearce v. Freeman, 238 F.Supp. 947 (E.D.La. 1965). That case concerned an actual conflict between an order made by the Secretary of Agriculture under the Agricultural Marketing Act and an order made by the Louisiana Commissioner of Agriculture and Immigration under the Louisiana Orderly Milk Marketing Law of 1958. These two orders were in direct conflict with each other and "a handler in the area affected cannot obey one order without disobeying the other." The district judge held that the state order must yield in the face of the federal regulation:

"* * * In brief, by the enactment of the Agricultural Marketing Agreement Act of 1937, as amended, Congress has pre-empted the entire field of marketing of milk in *interstate* commerce, and has, by this act, properly delegated to the United States Secretary of Agriculture the power to promulgate orders and regulations pursuant thereto. In addition, Congress authorized and directed the Secretary to assist a state, when requested to do so, in making effective a state marketing program in instances where the Secretary did not deem it necessary, at the time, to order federal regulation in that area different from the state regulations in effect. * * * If such orders are, in fact, contrary to or inconsistent with the acts or orders of the state in that area, the Secretary's orders are supreme, superseding all conflicting state orders." 238 F.Supp. at 955.

It is clear from the above language that the court recognized that Congress had not pre-empted the field of milk marketing to the exclusion of *all* state regulations that conflicted with the federal act. The court impliedly recognized the validity of nonconflicting state regulation in the area of milk marketing.

An examination of the Agricultural Marketing Act does not show any intent by Congress to impose its exclusive will upon the marketing of the various commodities regulated under the act. That portion of the act dealing with avocados was examined by the United States Supreme Court in Florida Lime and Avocado Growers, Inc. v. Paul, 373 U.S. 132, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963) and was found not to pre-empt the entire field of avocado marketing. It appears certain that the same result must be obtained with regard to the milk regulatory provisions of the federal act.

As to the petitioner's argument that the Robinson-Patman Act has pre-empted the field of price regulation in interstate commerce and that the Act "leaves no room for state regulation," it is also

without merit. If Congress chose to exclusively regulate price competition in interstate commerce it could do so, but a reading of the Robinson-Patman Act does not disclose such an intent. And since no authority whatsoever has been presented to indicate such an intention, we hold that this argument of exclusive pre-emption is without merit.

In conclusion this court holds that Congress has not pre-empted either the field of price competition in interstate commerce by way of the Robinson-Patman Act, nor the field of milk marketing by the Agricultural Marketing Act of 1937. We do, however, conclude that the State of Louisiana has unduly burdened interstate commerce insofar as it attempts to force Schwegmann Brothers to pay the out-of-state producer, Pure-Vac, the minimum price set by the Commission on sales of ice milk by Pure-Vac to Schwegmann in Tennessee with shipment by Pure-Vac into Louisiana under the circumstances described above. To the extent indicated herein, the plaintiff is entitled to the injunctive relief which he seeks and is hereby directed to present to the court a proposed judgment in accordance herewith.